***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as: *Page 2 
 STIPULATIONS
1. The case and the parties are subject to the North Carolina Workers' Compensation Act at all times relevant to this claim.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. An Employee-Employer relationship existed between Plaintiff and Aube's Inc. on or about November 3, 2008.
4. At all times relevant to this claim, Aube's Inc. was insured by State Farm Fire and Casualty Company.
5. On November 3, 2008, Plaintiff sustained an injury by accident within the course and scope of his employment with Aube's Inc.
6. Defendants filed a Form 63 in December 2008, paying the claim without prejudice. Pursuant thereto, Plaintiff received TTD payments in the amount of $210.10 based on his average weekly wage of $315.13. A Form 60 was subsequently filed in January 2009 accepting compensability of the claim. On March 23, 2009, Plaintiff returned to work light duty. A Form 62 was then filed evidencing Plaintiff's right to and receipt of TPD payments. Benefits were commenced. On March 31, 2009, TTD benefits were reinstated after the authorized treating physician removed Plaintiff completely from work. A second Form 62 was filed. TTD benefits continue.
7. Plaintiff's issues for hearing before the Deputy Commissioner:
 a. Whether Plaintiff is entitled to ongoing total disability compensation.
 b. What further medical treatment, including whether Plaintiff may be entitled to a change of physicians, is appropriate for Plaintiff? *Page 3 
 c. Did Defendants change Plaintiff's treating physician, Dr. Kim, without obtaining authorization from the Industrial Commission?
 d. Should Defendants be responsible for the authorization of the discogram ordered by Dr. Kim in December 2008?
 e. Did Defendants unnecessarily delay the order of the discogram as recommended by Dr. Kim in December 2008?
8. Defendant's issues for hearing before the Deputy Commissioner:
 a. Has Plaintiff satisfied his burden of establishing the existence of a continued disability under the North Carolina Workers' Compensation Act?
 b. Whether Plaintiff is entitled to ongoing total disability compensation.
 c. What further medical treatment, if any, is appropriate for Plaintiff?
 d. Whether Plaintiff's statements to his physicians concerning his daily activities and abilities are contradicted by his public actions and statements.
 e. Whether Plaintiff has received transportation benefits for which he was entitled.
 f. Do N.C. Gen. Stat. §§ 97-25 and 97-27 require Defendants to obtain authorization from the Industrial Commission to change a Plaintiff's treating physician?
 g. Should the opinion of Dr. Kim be given any weight over that of the authorized treating physicians regarding Plaintiff's medical condition, need for surgery, and restrictions or return to work issues? *Page 4 
 ***********
The following were marked and received into evidence by the Deputy Commissioner as:
 EXHIBITS
1. Stipulated Exhibit 1 — IC forms, medical records, and case management records.
2. Stipulated Exhibit 2 — Surveillance reports.
3. Stipulated Exhibit 3 — January 2009 surveillance DVD.
4. Stipulated Exhibit 4 — April and May 2009 surveillance DVD.
5. Stipulated Exhibit 5 — Performance physical therapy records.
6. Stipulated Exhibit 6 — Stacey Bergner's faxed updates/reports 9/14/09-12/23/09.
7. Stipulated Exhibit 7 — Lee Martin's 12/17/09 letter to DC Hall.
8. Stipulated Exhibit 8 — Aube's 11/12/09 and 11/19/09 letters to Brandon Helms.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was twenty-five years old at the time of the hearing before the Deputy Commissioner and worked for Defendant-Employer as a stock/sales associate. He sustained a low back injury on November 3, 2008, after stocking CV axles on an overhead shelf.
2. Plaintiff began treating with Dr. Jeffrey K. Cook at Cook Chiropractic on November 4, 2008 and complained of constant low back pain that he described as sharp, shooting, numb, and tingling. Dr. Cook diagnosed Plaintiff with a slipped disc with a severe pinched nerve and wrote Plaintiff out of work for November 4 and 5, 2008. *Page 5 
3. Plaintiff was evaluated at Cabarrus Family Medicine on November 6, 2008 by Dr. Roozchehr Safi, who noted that Dr. Cook had instructed Plaintiff to see his primary care provider due to the severity of pain. Plaintiff complained of low back pain that began after lifting a heavy box four days prior. X-rays of Plaintiff's lumbar spine were normal and Dr. Safi concluded that the symptoms were due to muscle spasms. He instructed Plaintiff to apply a heating pad to the area and take Ibuprofen. Plaintiff was directed to avoid heavy physical activity for a few weeks.
4. On November 10, 2008, Dr. Cook wrote Plaintiff out of work until November 14, 2008. On November 14, 2008, Dr. Cook ordered an MRI and he wrote Plaintiff out of work until November 22, 2008. Plaintiff underwent an MRI of the lumbar spine and a CT of the orbits at North Carolina Diagnostic Imaging that day. The scans were administered by Dr. Richard Dunlop who interpreted the images and concluded that the MRI revealed mild levoscoliosis, early degenerative disc disease at L2-3, disc bulging at L4-5 and L5-S1, and degenerative changes in the lower lumbar facet joints. He concluded that the CT scan was unremarkable.
5. Plaintiff went to Urgent Care at Harrisburg on November 14 and 17, 2008 and reported no changes in his condition. The nurses noted Plaintiff was taking Flexeril and attending physical therapy, but nothing was helping. They continued Plaintiff on Tylox and Flexeril, but discussed the possibility of not taking these medications.
6. Subsequently, Plaintiff sought treatment with Dr. Paul Kim at Carolina Neurosurgery Spine. Dr. Kim has been employed with Carolina Neurosurgery Spine for about a year and a half and is not board-certified. Dr. Kim first evaluated Plaintiff on November 19, 2008 and noted that Plaintiff presented with complaints of severe low back pain which radiated to his thighs and calves. Plaintiff also reported increased pain with sitting and standing and worse pain on the left than on the right. On examination, Plaintiff had significant low back *Page 6 
pain with range of motion and difficulty with ambulation, but he had full strength and normal sensation throughout. After reviewing Plaintiff's MRI, Dr. Kim reported there was accelerated degenerative disc disease at the L5-S1 level, a pars defect bilaterally at L5, and grade 1 spondylolisthesis at L5.
7. Dr. Kim testified that a pars defect is a defect in the pars interarticularis, which is part of the posterior arch of the vertebrae at L5. He also explained that spondylolisthesis is a slip in the spine related to the pars defect. Dr. Kim diagnosed Plaintiff with lytic spondylolisthesis at L5-S1 and ordered an epidural steroid injection at L5-S1 for symptom relief. He opined that Plaintiff's best option was an anterior lumbar interbody fusion at L5-S1 for mobilization and stabilization of the disc space.
8. The steroid injection was administered November 25, 2008 and Plaintiff returned to Dr. Kim on December 19, 2008 reporting 25% improvement with the injection, but he continued to experience significant constant low back pain. Dr. Kim testified that the fact that the pain radiated into Plaintiff's thighs and calves indicated L5-S1 involvement. Nevertheless, Dr. Kim reported that the physical examination showed that Plaintiff was virtually stable with normal reflexes and full strength in his upper and lower extremities. He also noted that the straight-leg raise test was negative, which indicated that there was no nerve compression. The only abnormality was Plaintiff's subjective report of increased pain with ranges of motion.
9. Dr. Kim recommended a discogram to verify that Plaintiff suffered pain at the L5-S1 level and if the results of the discogram revealed that L5-S1 was not the generator of Plaintiff's pain, then he would not recommend a lumbar fusion operation. On the other hand, if pain at L5-S1 was demonstrated on the discogram, then both Plaintiff and Dr. Kim agreed on having a posterior lumbar interbody fusion. The procedure involved removing the bone and *Page 7 
tissue compressing the L5 and S1 nerves, then performing a fusion by inserting screws and rods at L5-S1 to stabilize the spine. Dr. Kim wrote Plaintiff out of work at that time.
10. Despite not having seen Plaintiff for further evaluation, Dr. Kim referred Plaintiff to heat and massage physical therapy on December 29, 2008. Although he did not have a record in front of him at the time of his testimony, he believed that there was correspondence at his office notifying him that the discogram was denied and he had to consider alternative measures to rehabilitate Plaintiff given that he had some improvement with the injection.
11. Defendants conducted surveillance of Plaintiff on January 3, 2009. Plaintiff was observed attending a gun and knife show where he walked around looking at various exhibits for approximately two hours without sitting or resting.
12. Subsequently, Defendants referred Plaintiff for an Independent Medical Examination (IME) with Dr. Craig Brigham at OrthoCarolina. Dr. Brigham has been employed by OrthoCarolina since its inception in 2004 and he is board-certified in orthopedic surgery. The IME was conducted on January 21, 2009 and Dr. Brigham discussed the medical history with Plaintiff and conducted the physical examination prior to reviewing Plaintiff's prior medical records. Upon examination, Dr. Brigham found mild tenderness to palpation of the lumbar spine, but no other pertinent findings. He stated that the neurological examination was normal.
13. Dr. Brigham reviewed images from Plaintiff's MRI exclusive of the radiologist's report and, based on his own interpretation, concluded that there was no evidence of an acute disc herniation or nerve compression. He did see a stress fracture on the x-rays. Ultimately, he diagnosed Plaintiff with a lumbar sprain and stated that the radiologist's interpretation of the MRI was significantly over read, as neither Plaintiff's complaints nor the physical examination suggested "moderately severe compression upon both neuroforamina bilaterally." Dr. Brigham *Page 8 
noted that Plaintiff's subjective symptoms far exceeded his objective findings and he advised that Plaintiff was not a good candidate for surgery. He explained that based on 50 years of scientific evidence and the fact that he has the same condition as Plaintiff and had surgery, surgical intervention could lead to far worse pain.
14. During the deposition, Dr. Brigham was asked to review the September 2009 MRI report. After review, he testified that the recent report did not change his opinion regarding surgery and that the report actually confirmed his original opinion that there was no acute pathology. He stated that stress fractures are acquired between the ages of six and 12 and the MRI confirmed that Plaintiff's stress fracture was old, as there was no disc herniation, no acute injury, and no edema signal. He noted that he sees athletes with the same condition as Plaintiff and who are around the same age as Plaintiff and they are permitted to play professional football with no problems. Dr. Brigham further testified that, for treatment of stress fractures, he recommends heavy weightlifting because it is the only way to make the back stronger.
15. Subsequently, Plaintiff was referred to Dr. T. Kern Carlton at the Rehab Center for further treatment. Dr. Carlton testified he has practiced with the Rehab Center for 16 years and is board-certified in physical medicine, rehabilitation, and pain medicine. Dr. Carlton first evaluated Plaintiff on March 16, 2009 for complaints of ongoing pain that radiated down both legs. Plaintiff rated his pain as a 9/10 and claimed that his pain worsened with every movement. He reported that pain prevented him from sitting for more than 30 minutes, walking more than 10-15 minutes, standing for more than one hour, or having sex.
16. Dr. Carlton found tenderness in the lower lumbar region, decreased lumbar extension and flexion, and increased pain with movements in both directions on examination. Dr. Carlton noted Plaintiff reported some tightness in the hamstrings bilaterally, but did not *Page 9 
exhibit the classic radicular pain and the neurological exam was intact. He diagnosed Plaintiff with a lumbar strain with mild degenerative disc disease at multiple levels and moderately severe compression at L5-S1 along with lidex spondylolisthesis. He recommended physical therapy to instruct Plaintiff on a lumbar stabilization exercise program. Dr. Carlton explained the importance of proper body mechanics and following a home exercise program. He released Plaintiff to return to work with restrictions of no lifting greater than 10 pounds occasionally and alternate positions as needed.
17. On March 18, 2009, Defendant-Employer offered Plaintiff a job at the counter answering phones and waiting on customers that would accommodate his restrictions by letting him sit or stand and including assistance if he was asked to lift more than 10 pounds.
18. Plaintiff returned to Dr. Carlton on March 31, 2009 and reported that he returned to work for two days, but could only last for one hour. Dr. Carlton noted the physical examination was unchanged, but the straight-leg raising test increased Plaintiff's back pain. He wrote Plaintiff out of work until the next visit and told Plaintiff to continue physical therapy.
19. Throughout physical therapy, Plaintiff continued to report ongoing pain with no improvement. However, by April 7, 2009, Plaintiff reported that he was able to walk around his farm as much as he wanted. The therapist noted that Plaintiff exhibited improved upright posture and longer step lengths on the treadmill during ambulation. On April 13, 2009, Plaintiff advised the therapist that he walked more frequently the previous day during Easter activities with his family. Despite his reports of improvements, the therapist noted Plaintiff was exhibiting exaggerated behavior and had difficulty attaining and maintaining a neutral spine during activities. Plaintiff continued to exhibit exaggerated behavior on April 17, 2009. Nevertheless, the therapist stated that he was able to tolerate increased activity and had improved endurance. *Page 10 
20. On April 27, 2009, Plaintiff followed up with Dr. Carlton complaining of worse pain. He claimed that the physical therapy aggravated his symptoms and that he wanted to proceed with surgery. Dr. Carlton observed a great deal of behavior which made it appear that Plaintiff was in pain. He found marked lumbar tenderness as well as reduction in the lumbar range of motion. He noted, however, that he was neurologically intact and there was no radicular pain. Dr. Carlton advised Plaintiff he had nothing further to offer. He suggested Plaintiff get a third opinion regarding surgery and wrote Plaintiff out of work until the next visit.
21. Surveillance was again conducted on May 7 and 9, 2009. Plaintiff was observed walking, bending, and operating a motorcycle and he spent several hours at a restaurant bar standing, sitting, drinking, and socializing with patrons. On May 9, 2009, Plaintiff socialized with friends for about 30 minutes before getting on his motorcycle with a female companion and driving away with no sign of difficulty.
22. Subsequently, Plaintiff was referred to Dr. T. Scott Ellison at RoMedical for a third surgical opinion. Dr. Ellison has practiced at RoMedical for about 20 years and is board-certified in orthopedics with a fellowship in spinal surgery. Dr. Ellison first evaluated Plaintiff on August 30, 2009. Plaintiff complained of pain that radiated down his knees to his left ankle and right shin. Plaintiff exhibited limited range of motion due to low back pain, but had grossly normal motor strength in the lower extremities and was able to stand on his toes on examination. The examination was normal with the exception of a decreased quality to pinprick in the legs non-anatomically. Dr. Ellison explained that this meant that Plaintiff's discomfort did not fit a particular pattern or any known nerve disruption.
23. Dr. Ellison testified that during the evaluation Plaintiff mentioned Dr. Kim's recommendation for a discogram. Dr. Ellison explained that, based on his examination, there *Page 11 
was nothing indicating a discogram was necessary. He stated that, even if a discogram was conducted and provided a positive result, it did not necessarily mean that surgery was required.
24. Dr. Ellison ordered x-rays, which showed slight disc space narrowing at L2-3 with subtle grade-1 spondylolisthesis of L5-S1 with possible L5 pars defect. He compared those images to the MRI conducted on November 14, 2008. He noted the 2008 images were suboptimal and found it difficult to comment on those findings based on the quality of the studies. As far as he could tell, the L5-S1 foraminal stenosis mentioned in the 2008 report was not severe. Dr. Ellison ultimately concluded that he could not make any medical decisions without obtaining an updated MRI. He noted that Plaintiff gave a fairly dramatic presentation based on the mechanism of injury. He maintained Plaintiff's out of work status and referred Plaintiff for a MRI.
25. The MRI was conducted on September 1, 2009 and revealed very mild anterolisthesis at L5-S1 that may be related to pars defect. The radiologist noted that there was no herniated disc and there were no degenerative changes. On September 14, 2009, after reviewing the MRI, Dr. Ellison noted that the first MRI was over read and he diagnosed Plaintiff with a grade-1 lytic spondylolisthesis of L5/S1, meaning Plaintiff had a slight slip at L5/S1 along with stress fractures involving the pars of the bone at that same level. Dr. Ellison noted that, although they are called fractures, they are not necessarily fractures and Plaintiff's stress fractures certainly did not occur in the work accident of November 3, 2008. He believed Plaintiff's stress fractures were the result of non-unionized carbon ossification centers as the bones were forming during childhood and explained that some areas do not fuse together, which results in two bones, the front part of the spinal bone opposed with the back part of the spinal *Page 12 
bone. He noted that when he stated that surgery may or may not help Plaintiff, he meant that he had as much confidence that surgery would help as he did that surgery would not help.
26. Dr. Ellison examined Plaintiff again on October 12, 2009 and concluded that he could not explain why Plaintiff felt pain to the degree that he did due to his work accident. He explained that ever since the first time he saw Plaintiff, the "verbal and nonverbal pain communications seemed to be exuberant" and Plaintiff's reported 10/10 level of pain was disproportionate to the diagnosis given the mechanism of injury. Dr. Ellison believed that Dr. Kim's comments made Plaintiff feel like surgery was the only answer and he did not think that anyone else's recommendations would change Plaintiff's mind. In addition, he noted that Plaintiff was aware of the 2008 MRI report which indicated the existence of severe foraminal stenosis, which Dr. Ellison stated was counter to what Plaintiff actually had. Nevertheless, Dr. Ellison stated that these findings convinced Plaintiff that there was a lesion that required surgery.
27. Dr. Ellison treated Plaintiff through November 2009 and during those four months, he never recommended a discogram nor did he ever recommend surgery. He stated that reviewing the flexion and extension x-rays ordered by Dr. Kim would not change his recommendations. He noted that he would recommend surgery only if he saw persistent back pain related to the spondylolisthesis and, as a secondary indicator, radiating leg symptoms. He explained that although Plaintiff complained of some radiating leg pain, that pain did not necessarily correlate with the area of the stress fractures. Dr. Ellison did not recommend surgery because Plaintiff's reported discomfort and complaints did not match the pattern of anatomically identified lesions in the MRI. Ultimately, Dr. Ellison reported that, based on the imaging studies, physical exams, Plaintiff's history, and Plaintiff's generalized behavior, he would be concerned that surgery would not offer a significant change in Plaintiff's condition. *Page 13 
28. Dr. Ellison testified that based on his experience with Plaintiff's condition and his findings during the physical examinations, he did not see any reason why Plaintiff would not go back to regular duty work with no restrictions. He did not want to give Plaintiff the impression that this condition was going to cause problems for the rest of his life because there are a lot of people with this same condition who never have surgery and many do not have pain at all. Consequently, on November 4, 2009, Dr. Ellison released Plaintiff to sedentary work for one month followed by a return to regular duty work with no restrictions.
29. The Medical Case Manager assigned to Plaintiff's case was Stacey Bergner with Complete Case Management. Ms. Bergner holds a dual license as a registered nurse in New York and North Carolina and recently obtained her certification as an orthopedic nurse through the National Boards. She explained that her role as a medical case manager was to coordinate medical care, attend doctor's appointments, and make treatment recommendations to the adjusters based on the perspectives of both Plaintiff and the doctor.
30. Ms. Bergner first became involved with Plaintiff's case on November 17, 2008 when she was asked to make an appointment for Plaintiff to see an orthopedic surgeon. She scheduled an appointment with Dr. Belanger at OrthoCarolina within two days and left a message for Plaintiff advising him of the appointment. Plaintiff returned her phone call and stated that he did not want to see Dr. Belanger. During the conversation, Plaintiff's mother grabbed the phone and claimed that they were told to stay away from OrthoCarolina and she did not want her son treated there. Plaintiff's mother requested that Dr. Redding at Carolina Neurosurgery Spine treat him since five people from her church treated with Dr. Redding and were satisfied with his services. *Page 14 
31. Ms. Bergner relayed Plaintiff's request to the adjuster, Elise Cobb, and Ms. Cobb agreed to cancel the appointment with Dr. Belanger and schedule Plaintiff an appointment with Dr. Redding. However, Plaintiff never saw Dr. Redding. Ms. Bergner explained that she was able to get an appointment with Dr. Redding, but it was a couple weeks away and Plaintiff was in so much pain that he could not wait. Plaintiff claimed he could get an appointment sooner and Ms. Bergner advised him to let her know if he was able to get another appointment so that she could attend. Plaintiff was able to get another appointment and he left her a message the day of the appointment to tell her the appointment was scheduled for that afternoon. Ms. Bergner was in another appointment and did not get Plaintiff's message. Thus, Plaintiff attended the appointment without her and was evaluated by Dr. Kim.
32. Plaintiff called Ms. Bergner following the appointment and reported that Dr. Kim had immediately recommended surgery, but offered steroid injections in the interim to help with pain. Ms. Cobb approved the injection and it was conducted within a few days. After the initial appointment with Dr. Kim, Plaintiff insisted on having surgery. Ms. Bergner explained that Plaintiff was so adamant about having surgery that no other doctor could treat him due to his fixation with surgery.
33. Following the initial appointment, Plaintiff returned to Dr. Kim who recommended a posterior one-level fusion. Ms. Bergner relayed the recommendation to Ms. Cobb and she requested that Ms. Bergner schedule a second surgical opinion. She arranged a second opinion with Dr. Craig Brigham at OrthoCarolina. Ms. Bergner notified Plaintiff of the appointment with Dr. Brigham and he was anxious to attend. However, she noted that when she was asked to join the discussion following the private examination, she could sense friction. *Page 15 
34. Ms. Bergner spoke with Plaintiff's mother following the appointment with Dr. Brigham. Ms. Bergner stated that Plaintiff and his mother were unhappy with Dr. Brigham's examination and opinion. A follow-up appointment with Dr. Brigham was scheduled, but Plaintiff did not attend.
35. Ms. Bergner was subsequently instructed to schedule an appointment with Dr. Carlton, but she was not allowed in the room during the examination, as it was Dr. Carlton's policy to conduct private exams. Following Dr. Carlton's referral to physical therapy, Plaintiff missed two sessions of therapy and was late for a couple of other sessions. After attending several sessions of physical therapy, Plaintiff complained that it was making his condition worse. Dr. Carlton never stated that the physical therapy made Plaintiff's condition worse.
36. Ms. Bergner spoke to Dr. Carlton about enrolling Plaintiff in a comprehensive program run by the Rehab Center and explained that the program included physical therapy, group therapy, and a psychologist to help cope with chronic pain issues. Dr. Carlton initially thought the program would be good for Plaintiff, but decided against placing Plaintiff in the program when Plaintiff continued to insist on surgery.
37. In addition, Ms. Bergner noted in her June 8, 2009 rapid response that she observed Plaintiff dragging his right leg during the appointment with Dr. Carlton. She made note of her observation because Plaintiff's posture and leg-dragging seemed worse on that day. She noted that Plaintiff's behavior was observed by Dr. Carlton, as he usually came out to the lobby and escorted his patients back to the exam room. Neither Dr. Brigham nor Dr. Carlton found any neurological problems that would result in leg-dragging.
38. A consultation with Dr. Ellison was arranged in order to obtain a third opinion regarding surgery. However, the initial appointment was cancelled because Plaintiff failed to *Page 16 
obtain all his medical records prior to the appointment as instructed. Contrary to her normal practice, Ms. Bergner picked up Plaintiff's MRI films because Plaintiff failed to do so.
39. Subsequently, Dr. Ellison evaluated Plaintiff and according to Ms. Bergner, Dr. Ellison explained that Plaintiff's condition was normal, as approximately 20% of the population had the same condition. In addition, Ms. Bergner noted that Dr. Ellison opined that both of Plaintiff's conditions were pre-existing. Ms. Bergner testified that during the last visit with Dr. Ellison on November 4, 2009, Dr. Ellison determined that Plaintiff had reached maximum medical improvement and was ready to be released. She explained that because Plaintiff had been out of work for so long, Dr. Ellison released Plaintiff to return to sedentary work for one month, then to full duty work. Ms. Bergner noted that she understood Dr. Ellison's statements to mean that Plaintiff should return to full duty work after one month regardless of whether he actually ever returned to light duty for one month.
40. Ms. Bergner testified that Plaintiff was not happy with Dr. Ellison's decision to release him to return to work and told her, "You know we're going to do this all over again." She reported that Plaintiff referred to the time when Dr. Carlton released him to return to work and he could only last for an hour or two on concrete. According to Ms. Bergner, Plaintiff said, "You know I can only stand on concrete for so long. You know I'm going to be leaving early." However, Ms. Bergner stated that Plaintiff did not mention anything about not being able to return to work during the discussion with Dr. Ellison.
41. Ms. Bergner further testified that during that last visit, Dr. Ellison did not refer Plaintiff back to Dr. Kim. Plaintiff mentioned that he would like to return to Dr. Kim and Dr. Ellison indicated that he had no objection. In addition, Ms. Bergner noted that Plaintiff reported an inability to sleep at every visit with every doctor, but no doctor ever prescribed him any *Page 17 
medication for sleep due to his young age and the fact that the medication was highly addictive. She further testified that, out of all the doctors who evaluated Plaintiff, Dr. Kim was the only physician who recommended a discogram.
42. On November 12, 2009, Defendant-Employer renewed its invitation for Plaintiff to return to work and advised him that a position was available that would accommodate his restrictions of sedentary duty. When Plaintiff failed to show up for work or respond to the invitation by November 19, 2009, Plaintiff's employment was terminated as his failure to respond was considered a voluntary resignation of his employment with Defendant-Employer.
43. The Full Commission places more weight on the opinions of Dr. Brigham, Dr. Carlton, and Dr. Ellison than the opinion of Dr. Kim. Based on the evidence including Plaintiff's testimony, reports to his physicians, and review of the surveillance, the Full Commission does not find Plaintiff to be credible.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident on November 3, 2008. Defendants admitted liability for Plaintiff's injury pursuant to a Form 60. However, no presumption of disability is created by a Form 60 under which an employer admits compensability of an employee's injury. Sims v. Charmes/Arby'sRoast Beef, 142 N.C. App. 154, 542 S.E.2d 277, disc. reviewdenied, 353 N.C. 729, 550 S.E.2d 782 (2001). The only admission in a Form 60 is acceptance of liability for the employee's injury by accident arising out of and in the course of his employment. *Page 18 
2. Our Supreme Court has expressly stated that "a presumption of disability in favor of an employee arises only in limited circumstances." Johnson v. S. Tire Sales Serv.,358 N.C. 701, 706, 599 S.E.2d 508, 512 (2004). Specifically, in situations when there is (1) an executed Form 21; (2) an executed Form 26; or (3) a prior disability award from the Industrial Commission. Id. Thus, absent a Form 21, a Form 26, or a prior award of disability, the employee bears the burden of proving both the existence and the extent of disability. Harrington v.Adams-Robinson Enterprises,128 N.C. App. 496, 500, 495 S.E. 2d 377, 380 (Walker, J., dissenting), adopted per curiam,349 N.C. 218, 504 S.E.2d 786 (1998).
3. To support a conclusion of disability, the Commission must find that the Plaintiff was: (1) incapable of earning pre-injury wages in the same employment, (2) incapable of earning pre-injury wages in any other employment, and (3) the incapacity to earn pre-injury wages in either the same or other employment was caused by Plaintiff's injury. Coppley v. PPG Indus., Inc.,133 N.C. App. 631, 634, 516 S.E.2d 184, 186-87 (1999) (citingHilliard v. Apex Cabinet Co.,305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982)).
4. "Once the employee has met [his] initial burden of proving `disability,' the burden then shifts to the employer to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a job at pre-injury wages." Id. at 634-35, 516 S.E.2d at187. An employer can rebut the presumption of disability by showing that: (1) suitable jobs are available for the employee; (2) the employee is capable of getting said job taking into account the employee's physical and vocational limitations; (3) and the job would enable the employee to earn some wages. Cross v. Falk Integrated Technologies, Inc.,190 N.C. App. 274, 279, 661 S.E.2d 249, 254 (2008) (citingFranklin v. Broyhill Furniture Indus.,123 N.C. App. 200, 209, 472 S.E.2d 382, 388, cert. denied,344 N.C. 629, 477 S.E.2d 39 (1996)). *Page 19 
5. Here, there is no Form 21, Form 26, or prior award of disability. Therefore, Plaintiff bears the burden of proving, by the greater weight of the evidence, the existence and extent of his disability. Plaintiff failed to show the existence of any disability as defined in N.C. Gen. Stat. § 97-2(9). Dr. Ellison released Plaintiff to return to full duty work on November 4, 2009. Specifically, Plaintiff was instructed to return to sedentary work for one month, then to full duty work. Thus, at the very least, Plaintiff was able to return to full duty work by December 4, 2009.
6. An employer is required to provide an injured employee with medical treatment that may reasonably be required to effect a cure or give relief. N.C. Gen. Stat. § 97-25 (2008). The discogram recommended by Dr. Kim is not medical treatment that is reasonably required to effect a cure or provide relief.
7. Even if Plaintiff was entitled to additional medical treatment, he is not entitled to a change of treating physician. It is well established that the employer has the initial right to select the physician, surgeon, or hospital to treat and care for an injured employee. Scurlock v. Durham County General Hosp.,136 N.C. App. 144, 151, 523 S.E.2d 439, 444 (1999). Dr. Ellison shall remain Plaintiff's authorized treating physician.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff has failed to prove the existence of any ongoing disability and, thus, Defendants may terminate compensation benefits immediately.
3. Plaintiff's request for additional medical treatment is DENIED. *Page 20 
4. Plaintiff shall pay the court costs.
This 28th day of October 2010.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG CHAIR *Page 1